John MARSHALL

v.

DUNWOODY VILLAGE.

Civ. A. No. 91–1706.

United States District Court,
E.D. Pennsylvania.

Jan. 27, 1992.

Alice W. Ballard, Jean R. Sternlight, Samuel & Ballard, P.C., Philadelphia, Pa., for plaintiff.

Amy E. Wilkinson, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant.

## MEMORANDUM

GILES, District Judge.

Plaintiff was hired as Director of Marketing for defendant effective July 28, 1989 and terminated on October 31, 1989. He files this action against defendant, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), alleging that he was discriminated against on the basis of his sex. Plaintiff also sues defendant for breach of contract alleging that he detrimentally relied upon defendant's promise of employment. Defendant has moved for summary judgment on both claims.

## BACKGROUND

The undisputed facts follow. Defendant Dunwoody Village ("Dunwoody") is a life-care facility for the elderly. Plaintiff John Marshall ("Marshall") was hired as Director of Marketing for Dunwoody. Dunwoody created this position as part of its new marketing plan. The plan called for an experienced sales agent with public relations capabilities to improve Dunwoody's reputation in the life care industry. Marshall was to meet with prospective residents and attempt to sell them Dunwoody apartments or homes on its estate. Dun-

woody's President, Robert Domagalski ("Domagalski") hired Marshall for the position of Director of Marketing effective July 28, 1989. Marshall alleges that during his interview for the position with Dunwoody, Domagalski asked for a long term commitment from him so the new marketing plan might be effectively implemented. Marshall contends that he made such a commitment to Dunwoody when he accepted the position.

Before Marshall was hired, Peggy Wright ("Wright"), Domagalski's secretary showed units to prospective residents. Because it had no sample apartments, Dunwoody would show the apartments of current residents—once the residents' permission was received. Wright met with Marshall soon after he was hired and told him the names of residents who had previously given her permission to have their units shown. Marshall wrote down the names. (Marshall Depo., pp 40–41).[1] Residents Mr. and Mrs. Gerald Griffin ("The Griffins") appeared as the last names on plaintiff's list and he, therefore, showed their apartment to a prospective buyer, on October 4, 1989, when the Griffins were away on vacation. *Id.*

Marshall acknowledges that he was to check with the residents on his list to confirm that he could show the unit on a particular date, or that he was to check with the reception desk to determine whether a particular unit was unoccupied because the residents were on vacation. (Marshall Depo., p 30). Marshall had a master key that opened the door to all the units on the estate. (Marshall Depo., p 30). Marshall contends that on October 4th he was told at Dunwoody's reception desk, that the Griffins were on vacation and so he assumed that their apartment could be shown. (Marshall Depo., p 30).

Another resident, Alice Mooney ("Mooney"), had a key to the Griffins' apartment because she agreed to look after it while they were away. (Mooney Depo., pp 22–

23). On one of her visits to the Griffins' apartment, she discovered Marshall in the unit with the prospective resident. (Marshall Depo., pp 50–54). She asked him if he had the Griffins' permission to show the unit and Marshall answered that he did. (Marshall Depo., p 54). It is undisputed that Marshall never personally requested permission from the Griffins to show their unit and that he had never shown it before. (Marshall Depo., pp 41–42).

When they returned from their vacation, Mooney told the Griffins of the events that occurred on October 4th. Soon thereafter, the Griffins complained to Domagalski that their apartment had been shown without their permission. (Mooney's Depo., p 36). They also told Domagalski of their concern that Marshall may have used their apartment for a sexual tryst. The Griffins reported to Domagalski that they discovered, upon their return from vacation, that their bed was "rumpled" and that one of their toilets had been used but remained unflushed and the other toilet contained within it a "white waxy substance." (Domagalski's Depo., pp. 105–107).

Upon discovering that Marshall did not have the Griffins' permission to show their apartment, Mooney complained to Domagalski about what she considered a lack of security at Dunwoody, that is, management personnel entering a unit without the owner's permission. She said that she was very disturbed that Marshall told her he had permission to show the Griffins' apartment, when he did not, and she said also that she suspected that Marshall had a sexual tryst in the Griffins' apartment.

Both Marshall and Domagalski wrote letters of apology to the Griffins and Mooney, dated October 5 and 11, 1989, respectively, about the October 4th incident. In his letter to the Griffins, Marshall apologized for what had occurred and he acknowledged that he "blundered" by not checking with them personally before showing their apartment. (Marshall's letter to the Grif-

---

**1.** Depositions of Marshall and Mooney upon which defendant relies were taken in the related case of *Marshall v. Mooney,* Court of Common Pleas, Delaware County, No. 90–165367. Mar- shall provides no reason why this court should not consider these depositions as evidence in the present matter.

fins). In his letter to Mooney, Marshall stated that he was "remorseful and more cognizant." (Marshall's letter to Mooney).

Marshall alleges that Mooney was so incensed by the October 4th incident that she threatened to leave Dunwoody if he were not terminated. He also alleges that during one of his conversations within Domagalski in attempting to resolve and smooth over this matter, Domagalski told him that Mooney was a difficult person who was 'afraid of men'." (Marshall's Affidavit, p 4).

Marshall alleges that because of the October 4th incident, Domagalski met with him on October 9, 1989 and demanded his resignation. Marshall, however, refused to resign. (Marshall's Depo., pp 77–82). On October 11, 1989, Domagalski wrote a memorandum to Marshall relating all that had occurred between Marshall, the Griffins and Mooney. In that letter, he told Marshall that his employment was contingent upon his gaining the confidence of the residents and that a future incident would be grounds for dismissal. (Domagalski's Memo., p 1).

On October 13, 1989, Domagalski wrote a second letter to Mooney apologizing again for the October 4th incident. He told Mooney of his desire that she remain at Dunwoody but he emphasized that there was no evidence of Marshall having had sexual intercourse with the prospective resident in the Griffins' apartment, and that indeed, because of Marshall's reputation, he found such an allegation hard to believe.

Dunwoody alleges that during the weeks that followed the incident it "learned that several [other] Dunwoody residents had come to believe that Mr. Marshall lacked credibility." (Dunwoody's Brief, pp 15–16). On October 31, 1989, Domagalski wrote a memorandum to Marshall terminating his employment. In this memorandum, Domagalski stated that Dunwoody was terminating him for lacking credibility with the residents and for having an insensitive demeanor.

Marshall brings this action against Dunwoody alleging both employment discrimination and breach of an implied contract of employment. Dunwoody moves for summary judgment.

## LEGAL STANDARD

■ The Federal Rules of Civil Procedure, Rule 56(c) provides that summary judgment may be granted only if there exists "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c). To establish a genuine issue of material fact the non-moving party must demonstrate evidence of record beyond the pleadings to create an issue of material fact on "an element essential to the party's case and on which that party will bear the burden of proof at trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Stated another way, a fact is material if the evidence supporting it could lead to a jury verdict for the non-moving party. If reasonable minds could differ as to the importance of the evidence, a court may not grant summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 250, 251–52, 106 S.Ct. 2505, 2510, 2511, 2512, 91 L.Ed.2d 202 (1986). If no such issue of fact is established, summary judgment will be granted if the moving party is entitled to judgment as a matter of law.

In ruling on a motion for summary judgment, this court must consider the evidence in its entirety to determine whether issues of fact exist. *Manetas v. International Petroleum Carriers, Inc.*, 541 F.2d 408 (3d Cir.1976). The evidence must be construed in favor of the non-moving party. A grant of summary judgment is inappropriate if the non-moving party can credibly support its claim. *Lynn v. Heyl & Patterson, Inc.*, 483 F.Supp. 1247 (W.D.Pa.1980), *aff'd without op*, 636 F.2d 1209 (3d Cir.1980).

## ANALYSIS

I. *Title VII Claim*

Marshall's suit against Dunwoody for employment discrimination relies primarily upon three assertions. First, he contends that Dunwoody terminated his employment after receiving considerable pressure to do

so from Mooney, who he alleges wanted him fired because of what he characterizes as a fear of men. Specifically, Marshall alleges that "Domagalski was aware, and told [him], that Mooney was a difficult person who was 'afraid of men'." (Marshall's Amended Complaint, p 7). Therefore, Marshall asserts, that Domagalski fired him to assuage Mooney's alleged fear. *Id.*

Second, Marshall alleges that as a male employee, he received harsher treatment from Dunwoody than any of Dunwoody's female employees. (Marshall's Brief, p 16).

Finally, he maintains that Dunwoody subsequently hired a woman for the Marketing Director position and that this evidences *prima facie* sex discrimination. *Id.*

Under Title VII, to plead a *prima facie* case of unlawful discharge, plaintiff must allege: 1) that he is in a protected class, 2) that he was qualified for the position he held, satisfying the normal requirements of the job, 3) that he was discharged, and 4) that the position was filled by one not within the protected class or that others not in the protected class were treated more favorably. *Jackson v. University of Pittsburgh*, 826 F.2d 230, 233 (3d Cir.1987), *cert. den. University of Pittsburgh v. Jackson*, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); *Flowers v. Crouch–Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir.1977).

■ To support his sex discrimination claim, Marshall offers evidence that resident Mooney wanted him fired. Marshall claims that he was told by Domagalski that Mooney "has a fear of men." (Marshall's Amended Complaint, p 7). He emphasizes Domagalski's letters to him and Mooney to prove that Dunwoody fired him to assuage Mooney's fear and prevent her from leaving Dunwoody.

The court finds, however, that while one may reasonably construe from these letters that Mooney wanted Marshall fired, these letters only suggest that she wanted him fired because she believed that Marshall behaved improperly by showing the Griffins' home without their permission, and because she believed that he had a sexual "tryst" in the Griffins' home. The court

cannot find anything in either of these letters that would lead to a reasonable inference that Mooney wanted him fired solely because he is male and without regard to the trespass incident which Marshall acknowledges was his fault.

Marshall emphasizes Mooney's alleged threat to leave Dunwoody as proof of his sex discrimination claim. He alleges that as a result of Mooney's pressure, Domagalski met with him on October 9th and demanded his resignation. Whether this be true or not, the undisputed fact is that Marshall did not resign on October 9th, nor did Dunwoody fire him on this date.

Indeed, on October 13th, Domagalski wrote a letter to Mooney stating that he did not think terminating Marshall for the incident was appropriate, although he did give Marshall "a strong censure with the proviso that a reoccurrence would result in his immediate termination." (Domagalski's Letter to Mooney). Also, in response to Mooney's accusation of Marshall having sexual intercourse with a potential resident in the Griffins' home, Domagalski stated in this letter that "there seems to be lack of direct evidence to support this and considering [Marshall's] reputation it would be highly unlikely." *Id.*

The uncontradicted evidence, therefore, is that Domagalski wrote to Mooney in defense of Marshall with respect to all her claims and concerns surrounding the incident in the Griffins' home. In the face of this evidence, Marshall has not advanced any evidence to support his allegation that Dunwoody terminated him to assuage Mooney's "fear of men."

■ Moreover, assuming for the purposes of deciding this motion, that Mooney did have an alleged "fear of men" and therefore wanted Marshall fired, to state a *prima facie* case of sex discrimination Marshall must show that he could have successfully carried out his duties as Marketing Director for Dunwoody, satisfying the normal requirements of the job. The court finds that Marshall has not adduced any evidence to support such a conclusion.

Marshall does not dispute that when he was hired by Dunwoody, Domagalski advised him of the importance of developing and maintaining a good relationship with Dunwoody's residents. Dunwoody outlined two primary reasons for insisting that Marshall maintain a congenial relationship with its residents: 1) in attempting to keep Dunwoody Village 100% occupied, Dunwoody relies heavily on its current residents to recommend the Village to friends; and 2) since there are no spare units within the Village complex to show to prospective residents, Dunwoody relies on the courtesy of its residents to open their homes for viewing by the public. (Domagalski's Affidavit, pp 1–2).

In a memorandum, Domagalski advised Marshall that the October 4th incident may have caused irreparable damage to Marshall's credibility with the residents. He warned Marshall that because Dunwoody's residents are its most effective marketing tool, a loss of confidence in him by the residents would surely result in the failure of Dunwoody's marketing plan. (Domagalski's October 11th Memo. to Marshall).

After the October 4th incident, Domagalski discovered other Dunwoody residents who also did not feel Marshall was credible and did not feel comfortable with him. (Domagalski Affidavit, p 2).[2] When in the weeks that followed the October 4th inci-

dent Dunwoody did not see a change in Marshall's demeanor with the residents, it concluded that for the success of its marketing plan it was best to terminate him.[3] Marshall has not challenged these allegations, nor has he submitted any evidence supporting an alternative opinion of his relationship with Dunwoody residents.[4]

■ Marshall claims that as a male employee, he received harsher treatment from Dunwoody than any of its female employees. He refers the court to another incident that arose with the Griffins' home to prove this allegation. (Marshall's Brief, p 10). There, the Griffins suspected that someone was coming into their home and stealing liquor, so they reported their suspicion to Domagalski. Domagalski referred the incident to security personnel without making an investigation himself of the female housekeepers who maintained the Griffins' quarters. (Domagalski Depo., pp 133–135). Since Domagalski did not question the female housekeepers, but rather left any investigation up to the Dunwoody security department, Marshall argues that Domagalski's conduct in handling this event demonstrates that if he had been a woman, he would not have been terminated. (Marshall's Brief, p 10).

The court, however, finds that this reasoning has no justification. Simply because Domagalski did not personally inves-

---

2. *See, also,* statement of Josephine Getze, a Dunwoody resident who is also a member of the Board of Trustees of Dunwoody Home. In her statement, Getze writes:

> ... Mr. Marshall struck me as a car salesman type of individual who is "very breezy". He simply was not the right person to attract prospective residents to Dunwoody Village. I conveyed to the President and Chief Executive Officer, Robert Domagalski, my concerns that Mr. Marshall was not the right person for the position of Director of Marketing because of his heavy sales technique.

(Dunwoody's Brief, Exhibit M).

3. See Dunwoody's letter terminating Marshall, written by Domagalski, dated October 31, 1989. In this letter, Domagalski stated:

> The primary reason [for your termination] is your inability to generate support from the residents. I see them as our greatest resource in selling Dunwoody yet, you lack credibility with them. Recent events and your overall demeanor with them demonstrates a lack of

sensitivity. The environment at a community such as ours is a fragile one. I'm afraid the impression you give is one of insincerity and this has affected the acceptance of the Marketing program at Dunwoody.

4. However, from Marshall's letter to Dunwoody's management, dated November 14, 1989, it is apparent that he believed that Dunwoody gave too much credence to Dunwoody residents' comments. In this letter Marshall states:

> I think we were on the right track and that throwing a switch at three months was not management's finest hour. Residents have little stake in spending money to overcome competition. If their comments are given too much weight it is impossible to effect immediate change. Sadly the administrator's life depends on total acceptance daily by all the residents.

This letter also makes apparent that Marshall and Dunwoody had a difference of opinion on how best to effectuate Dunwoody's marketing plan.

tigate this incident does not mean that he disregarded the Griffins' concern, nor does it mean that he showed bias towards Dunwoody's female employees. Domagalski reported the incident to Dunwoody's security personnel and requested that an investigation be done. Such actions could not be reasonably construed as showing bias for Dunwoody female employees. In light of this, the court finds that Marshall has failed to adduce an example of a female Dunwoody employee receiving more lenient treatment than he received from Dunwoody—although she also failed to show proper discretion in carrying out work duties.

Additionally, the alleged facts pertaining to the missing liquor incident are grossly different from the facts surrounding Marshall's termination. First, there was no probative evidence that any female employee stole liquor from the Griffins' home. In contrast, Marshall was disciplined for having entered the Griffins' home without the Griffins' consent. Indeed, he has since admitted that taking such an action was a mistake. Further, he has not contradicted that the primary reason for his termination was his failure to gain the confidence of Dunwoody residents so as to carry out successfully the essential marketing plan.

While it is true that Dunwoody subsequently hired a woman into the position of Marketing Director, such action does not alter the conclusion that Dunwoody terminated Marshall for reasons other than one prohibited by law.[5]

In sum, the court finds that Marshall cannot make out a *prima facie* case of sex discrimination against Dunwoody. Summary judgment, therefore, is hereby granted for Dunwoody and against Marshall on the Title VII claim.

## II. *Breach of Contract Claim*

■ Marshall also alleges a breach of contract claim against Dunwoody.[6] Essentially, Marshall contends that "[he] had an oral implied contract with Dunwoody such that he could not be terminated while implementing [Dunwoody's] marketing plan, absent good cause." (Marshall's Brief, p 20). Marshall claims Dunwoody breached this alleged implied contract, upon which he detrimentally relied, by terminating his employment as Marketing Director.

■ Dunwoody denies that any contract expressed or implied existed between itself and Marshall. It claims that "Marshall was hired as an at-will employee," and that "he had neither a written nor a verbal contract of employment with Dunwoody." (Dunwoody's Brief, p 9). In addition, it maintains, that "[Marshall's] employment was terminated for cause." *Id.* at 10. Therefore, Dunwoody asserts that Marshall's breach of contract claim is groundless.

Under Pennsylvania law, "the employment relationship is presumed to be employment-at-will unless the employee can overcome the presumption with evidence of definite and specific terms of employment concerning length of employment or cause for termination." *Engstrom v. John Nuveen & Co.*, 668 F.Supp. 953, 957 (E.D.Pa. 1987).[7] An employment-at-will arrangement generally allows either party to ter-

---

**5.** Moreover, Dunwoody hired its present Marketing Director, Elaine Kaiser, in 1990—more than a year after Marshall was terminated.

**6.** From the outset, the court acknowledges that it may choose not to exercise pendent jurisdiction over Marshall's breach of contract claim, since Marshall's sex discrimination claim against Dunwoody fails. *See Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir.1976) (if it appears that the federal claim is subject to dismissal under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances). However, considering the commonality of the operative facts pertaining to Marshall's

federal and state claims, the stage of litigation that this case has reached (the eve of trial), and that Marshall voluntarily brought his state claim to this court for adjudication, this court will also decide this matter. *See Nanavati v. Burdette Tomlin Memorial Hospital,* 857 F.2d 96, 103–106 (3d Cir.1988), and Chief Judge Sloviter's dubitante opinion in *Weaver v. Marine Bank,* 683 F.2d 744, 748 (3d Cir.1982).

**7.** *See, also, Murray v. Commercial Union Ins. Co. (Commercial),* 782 F.2d 432 (3d Cir.1986); *McWilliams v. AT & T Informations Systems, Inc.,* 728 F.Supp. 1186, 1195 (W.D.Pa.1990); and *Darlington v. General Electric,* 350 Pa.Super. 183, 504 A.2d 306, 311 (1986).

minate the employment relationship for any reason or for no reason at all. *Darlington v. General Electric*, 350 Pa.Super. 183, 188, 504 A.2d 306, 309 (1986). Therefore, "[t]he modification of an 'at-will' relationship to one that can never be severed without 'just cause' is such a substantial modification that a very clear statement of an intention to so modify is required." *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 660 (3d Cir.1990) citing *Veno v. Meredith*, 357 Pa.Super. 85, 99, 515 A.2d 571, 578 (1986).

Thus, in analyzing the specific arrangement of any employment relationship "only 'clear evidence that the parties intended to contract for a definite period' will set aside the presumption" that the parties had an at-will employment relationship that can be terminated without just cause. *Id.* at 660. The court finds that no such clear evidence exists in the instant case.

In pleading his breach of contract claim, Marshall relies primarily on a discussion he had with Domagalski during his job interview with Dunwoody. Marshall states that during the interview, Domagalski required him to make a commitment to stay on with Dunwoody while it implemented its new marketing plan. (Marshall's Amended Complaint, p 9). Marshall states that Domagalski was concerned that if he offered the Marketing Director position to him, Marshall would accept the job merely as a stopgap until he could find a more lucrative job elsewhere. (Marshall's Brief, p 22). Domagalski explained his concern as follows:

> I felt [Marshall] was pretty successful in what he was doing in real estate. I realized that the money that we offered was well below market value for someone that had the background that he had and I was just wondering whether or not this was a situation where he was going to take on this job for a few months and then move on when something became more attractive to him.

(Domagalski Depo., p 51).

Domagalski, therefore, alleges that during Marshall's interview, he expressed candidly his apprehension to Marshall and told him that he would have to make a commitment to stay on with Dunwoody while the marketing plan got underway. *Id.* at 52.

Based on this discussion, Marshall asserts that "because Dunwoody required him to make a long-term commitment to Dunwoody and because he provided Dunwoody with substantial additional consideration when he agreed to forego his personal real estate practice, Marshall was entitled to a contract for a reasonable period of time." (Marshall's Amended Complaint, p 9). This court disagrees.

Pennsylvania law requires that the court assume that Marshall was an employee-at-will unless he can adduce "clear evidence" that Dunwoody hired him under "definite and specific terms of employment concerning [his] length of employment or cause for termination." *See Engstrom*, supra, at 957. Under this principle, Domagalski's request that Marshall stay on with Dunwoody until the marketing plan was fully underway cannot be interpreted reasonably as one for a "specific" length of employment.

While Dunwoody told Marshall that the plan would take three to four years to implement, such a statement does not denote a definitive length of time. Therefore, Marshall's claim that he was asked to make "a long term commitment" is insufficient, as a matter of law, to establish that he had an implied contract with Dunwoody.

■ Moreover, Marshall has not adduced evidence to support the conclusion that he conferred a substantial benefit, or that he sustained a substantial detriment by becoming a Dunwoody employee. Since there is no written agreement between the parties, such evidence is required to establish the existence of an implied contract.[8] When Marshall made his decision to work for Dunwoody as its Marketing Director, he did so voluntarily. Simply because he left his last employment to take a new job

---

8. *See, e.g., Scott v. Extracorporeal, Inc.*, 376 Pa.Super. 90, 100, 545 A.2d 334, 339 (1988) and *Clay v. Advanced Computer Applications*, 370 Pa.Super. 497, 512, 536 A.2d 1375, 1383 (1988).

with Dunwoody does not equate to him conferring a substantial benefit upon Dunwoody, nor does it equate to him having sustained a substantial detriment. He freely made a career choice. Marshall's decision to leave his personal real estate career cannot then be viewed as "substantial additional consideration" made to Dunwoody in exchange for employment.[9]

Therefore, as a matter of law Marshall cannot maintain a claim for breach of contract. Accordingly, summary judgment is hereby granted in favor of Dunwoody and against Marshall.