Juanita C. **MARTIN**

v.

**SAFEGUARD SCIENTIFICS, INC.;**
**and Interactive Marketing**
**Ventures, Inc.**

**Civil Action No. 96–8293.**

United States District Court,
E.D. Pennsylvania.

June 4, 1998.

Howard A. Rosenthal, Patrick J. Doran, Pelino & Lentz, P.C., Philadelphia, PA, for Plaintiff.

Thomas J. Bender, Jr., Donald W. Schroeder, Buchanan Ingersoll Professional Corporation, Philadelphia, PA, for Defendants.

## MEMORANDUM

DuBOIS, District Judge.

This matter comes before the Court on Motion for Partial Summary Judgment Pursuant to Federal Rule of Civil Procedure 56 of Defendants Safeguard Scientific, Inc. ("SSI") and Interactive Marketing Ventures, Inc. ("IMV"). Defendants seek partial summary judgment on the grounds: (1) that SSI cannot be held liable for the allegedly discriminatory employment practices of IMV because the two corporations are not a "single employer" for purposes of Title VII, 42 U.S.C. § 2000e *et seq.;* (2) that plaintiff, Juanita C. Martin ("plaintiff" or "Ms. Martin") has produced insufficient evidence that she gave "additional consideration" when accepting employment at IMV and thus cannot overcome the presumption that her employment was at-will and may not, therefore, maintain her state law claim that her termination was a breach of contract; (3) that plaintiff has demonstrated neither "extreme and outrageous conduct" on the part of defendants nor produced the medical evidence necessary for her intentional infliction of emotional distress claim to survive; and (4) that plaintiff cannot claim damages for lost wages or benefits from IMV after May 31, 1996, because IMV initiated a "mass layoff" on that date.

The Court will grant defendants' Motion with respect to the issue of whether IMV and SSI were a single employer because there is no genuine issue of material fact as to that claim. The Court will, however, deny defendants' Motion as to the issues of whether (a) the presumption that plaintiff's employment was at-will has been overcome and (b) plaintiff can recover damages for the period after May 31, 1996. The Motion with respect to plaintiff's claim of intentional infliction of emotional distress will be denied as moot

because plaintiff has voluntarily withdrawn that claim.

## I. BACKGROUND

The following facts are drawn from the affidavits, depositions, documentary evidence and papers submitted by the parties. Where the evidence is contradictory, or facts are disputed, the Court so indicates. In deciding this Motion, the Court relies only on undisputed facts.

Charles Andes, Chief Executive Officer ("CEO") of IMV at times relevant to this case, had considerable experience with direct marketing, having served as CEO of Franklin Mint for approximately thirteen years in the 1970s and 1980s. In 1994 he drew on this experience and developed the concept of an "interactive marketing database company." Mr. Andes brought this new concept of direct marketing to SSI, a publicly traded investment company, seeking start-up capital for IMV. SSI invested heavily in IMV. All of IMV's start-up capital—an investment of five million dollars—came from SSI; in exchange, SSI obtained a 70% equity stake in IMV. The remaining 30% was allocated to Mr. Andes for distribution "at his discretion" among the IMV managers he hired.

After making its investment, IMV became what SSI refers to as a "partnership company." Although called a "partnership company," IMV had an independent corporate existence, with its own articles of incorporation, by-laws and board of directors. As part of SSI's oversight of its substantial investment in this "partner," SSI officers assumed positions on IMV's board. In addition, SSI provided a portfolio of services to IMV such as administrative support, tax advice and legal services. While it nominally charged IMV for some of these services, it never collected this money because IMV never generated independent operating revenue.

IMV had a unique management structure, also created by Mr. Andes. The top managers of IMV were organized into teams of "senior partners" who were equals within the company's management structure. It was into this group of "senior partners" that plaintiff was recruited. Plaintiff had worked at Franklin Mint until 1991 where she ulti-

mately rose to the position of Executive Creative Director. After leaving Franklin Mint, plaintiff established a consulting business called "Innovation." By the end of 1994, she was on retainer to two clients who were paying her $9,000 a month for her services. After expenses, her 1994 net taxable income was $5,455.

Plaintiff was induced to leave her consulting practice by the promise of a job as creative director and "senior partner" at IMV. Her recruitment onto the IMV team began when Charles Wickard, a "senior partner" at IMV and a former colleague of plaintiff's at Franklin Mint, recommended her as a candidate to Mr. Andes. Mr. Andes contacted plaintiff in February, 1995 and she met with him that same month at SSI headquarters, where his office was located. The next day she accompanied him on SSI's corporate jet to Connecticut where she met with representatives of SSI as well as representatives of another SSI "partnership company" and a potential corporate customer of IMV.

Plaintiff was offered a job by Mr. Andes upon their return to Pennsylvania. She asserts that she accepted the position upon the understanding that her base salary was to be $110,000 per year, supplemented by an additional $110,000 in guaranteed "project management fees." In addition, plaintiff alleges that Mr. Andes promised plaintiff a position as CEO of another start-up company which was to specialize in the marketing of collectibles.

After this promising start, however, things quickly turned sour for plaintiff. Shortly after beginning work at IMV, although hired as a "senior partner/creative director," plaintiff was assigned to work under other "senior partners"—called "senior partners-in-charge"—who had ultimate decision making authority for their projects. This arrangement resulted in friction. At least two senior partners-in-charge complained to Mr. Andes about plaintiff's performance. After those initial complaints, plaintiff's termination was considered by Mr. Andes and Richard Miles (another "senior partner" at IMV), and the ramifications of firing her were then explored with attorneys working for SSI. Instead of

terminating her at that time, Mr. Andes issued a memorandum seeking to clarify plaintiff's role in relation to senior partners-in charge. According to defendants, problems continued, however, and by the end of August, 1995, Mr. Andes, again in consultation with Mr. Miles, decided to terminate plaintiff. Plaintiff was terminated in August, 1995.

During this period, plaintiff alleges that she was subject to repeated episodes of harassment. She claims that as the only female "senior partner" her authority was consistently undercut until she was eventually fired. Although hired as a "senior partner" she was, she claims, treated as less-than-equal by other "senior partners." Plaintiff alleges that this treatment was manifested in many ways, including her exclusion from meetings and a refusal to give her any significant authority (such as by appointing her to lead a project) or to provide her with information necessary to do her job. When plaintiff complained, as she says she consistently did, her complaints were ignored. In addition, plaintiff alleges that she was subject to sexually offensive language and innuendo from a number of other officers of IMV, including at least one incident in which she was shown sexually explicit pornography. Her complaints about these incidents were also, she says, ignored.

In May 1996, IMV, under the direction of a new CEO, Hillary Grinker, engaged in a "mass lay-off" of "senior partners." Before taking this step, Ms. Grinker consulted SSI attorneys. Despite this layoff, after May 1996, at least some former "senior partners" continued to be paid by IMV as consultants. As of August 1997, defendants assert that IMV stopped functioning as an operating entity.

## II. LEGAL DISCUSSION

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.

In an employment discrimination case, "the burden of persuasion on summary judgment remains unalterably with [the employer] as movant. The employer must persuade the court that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to [the plaintiff], no reasonable jury could find in [the plaintiff's] favor."

*Marzano v. Computer Science Corp., Inc.,* 91 F.3d 497, 502 (3d Cir.1996) (quoting *Sorba v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200, 201–02 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988)). With this standard in mind, the Court turns to the grounds upon which defendants seek partial summary judgment.

### B. Are IMV and SSI a "Single Employer" for purposes of Title VII?

#### 1. Legal Standard

While the Third Circuit has not directly addressed the exact question posed by this case—under what circumstances might a majority equity holder be held liable, under Title VII, for the discriminatory employment acts of the corporation in which it holds stock—it has written, in *Marzano v. Computer Science Corp., Inc.,* 91 F.3d 497, 502 (3d Cir.1996), on the nearly identical question of a parent corporation's liability for the employment decisions of a wholly owned subsidiary. Although not wholly owned, because SSI controlled more than fifty percent of IMV's equity, the Court will hereinafter refer to IMV as the "subsidiary" of SSI.[1]

---

1. The principal factual difference between the case at bar and the situation in *Marzano* is that SSI is merely a majority shareholder of IMV (plaintiff's immediate employer) whereas the plaintiff's direct employer in *Marzano* was the wholly owned subsidiary of the corporation the plaintiff sought to hold liable. This distinction is immaterial, however, for a parent which wholly owns a corporate subsidiary is simply another kind of shareholder and, under long-held principles of corporate law, "generally a shareholder is not personally liable to perform corporate obligations." *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521–22 (3d Cir.1994) (making statement in context of suit against sole shareholder of a corporation); *see also NLRB v.*

■ The parties urge the Court to analyze the question at issue by applying a four-factor test established by the National Labor Relations Board ("NLRB") to determine if two apparently independent entities are actually a "single employer." While this "single employer" test was not expressly applied by the Third Circuit in *Marzano*, the circuit court has approved the test in other circumstances. In *N.L.R.B. v. Browning–Ferris Industries*, 691 F.2d 1117 (3d Cir.1982), the Third Circuit was required to determine, on appeal from an administrative decision of the NLRB, whether Browning–Ferris Industries was a "joint employer" which could be held liable for unfair trade practices. That opinion provides a detailed description of the "single employer" doctrine:

> A "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer." The question in the "single employer" situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise*. ... In answering questions of this type, the Board considers the four factors approved by the *Radio [and Television Broadcast Technicians Union 1264 v. Broadcast Serv. Of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965)] court ...:(1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership. Thus, the "single employer" standard is relevant to the determination that "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise." *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 ... (1960). "Single employer" status ultimately depends on all the circumstances of the case and is characterized as an absence of "arm's length relationship found among unintegrated companies." *Local 627, International Union of Operating Engineers v. NLRB*, 518 F.2d 1040, 1045–46 (1975), *aff'd on this issue sub nom. South Prairie Construction Co. v. Local No. 627, Intern. Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 ... (1976). ...

*Browning–Ferris*, 691 F.2d at 1122 (emphasis in original) (some citations omitted). This "single employer" test is commonly referred to as the "integrated enterprise test." *See, e.g., Frank v. U.S. West, Inc.*, 3 F.3d 1357 (10th Cir.1993); *Beckwith v. Internat'l Mill Services, Inc.*, 617 F.Supp. 187, 189 (E.D.Pa. 1985).

In *Marzano*, a female employee brought, *inter alia*, a Title VII discrimination action against her former employer and its parent. In the course of its opinion, the circuit court addressed—for the first time in the Third Circuit—the extent of a parent corporation's liability for the employment decisions of a wholly owned subsidiary. The court, in determining the appropriate standard for deciding whether or not the parent could be held liable, turned to principles of corporate law and framed the issue as one of whether the corporate veil could be pierced. Examining New Jersey corporate law (the state of incorporation), the court first noted that shareholders are normally "insulated from the liabilities of corporate enterprise ... [e]ven in the case of a parent corporation and its wholly owned subsidiary...." *Marzano*, 91 F.3d at 513 (internal quotations omitted). To strip entities of that insulation, a court must find that a "subsidiary was a mere instrumentality of the parent corporation ... [that is, that] the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id.* (internal quotations omitted).

The plaintiff in *Marzano* argued that the parent should be held liable because: (1) plaintiff was initially hired by the parent and always believed she was employed by the parent; (2) when the division for which she initially worked merged with another subsidiary, there were no apparent changes in management; (3) plaintiff received paychecks from the parent for some time and belonged to the parent's pension plan; (4) the policy at

*Deena Artware, Inc.*, 361 U.S. 398, 402–03, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960). Thus, the *Mar-* zano court's analysis offers guidance to the Court in the case at bar.

issue in the suit was based on one promulgated by the parent; and (5) plaintiff was regularly involved with the corporate parent while employed at the subsidiary.

The Third Circuit concluded that the facts recited above, even if proved, did not demonstrate that the subsidiary and its parent "were so interrelated and integrated in their activities, labor relations and management that" the corporate veil should be pierced. *Id.* at 514 (internal quotation omitted). While the court did not adopt a specific test (instead examining all the circumstances in order to determine the degree of interrelationship) the factors it mentioned—integration of activities, labor relations and management—are three of the four factors in the National Labor Relations Board's "single employer" test.[2] This Court concludes therefore, that in the context of employment discrimination, the four-factor "integrated enterprise test" is most appropriate.[3] *See also Daliessio v. Depuy, Inc.,* C.A. No. 96–5295, 1998 WL 24330 (E.D.Pa. Jan.23, 1998) (employing the "integrated enterprise test" on motion of parties under Federal Rule of Civil Procedure 12(b)(1) in context of determining whether defendants were "employer" within the meaning of Title VII); *Beckwith v. Internat'l Mill Services, Inc.,* 617 F.Supp. 187, 189 (E.D.Pa.1985); *Ratcliffe v. Insurance Co. of North America,* 482 F.Supp. 759, 764 (E.D.Pa.1980) (cited with approval by *Marzano* ).

▮ This conclusion does not end the Court's inquiry, however, for the proper application of this test must still be determined. A review of the case law of this and other circuits shows that the four-pronged inquiry is not to be rigidly applied. " '[A] plaintiff's status as an employee under Title VII can be determined only upon a careful analysis of the myriad facts surrounding the employment relationship in question.' " *Graves v. Lowery,* 117 F.3d 723, 729 (3d Cir.1997) (quoting *Miller v. Advanced Studies,* 635 F.Supp. 1196 (N.D.Ill.1986)). Thus, other factors may be considered. For instance, "[a]lthough employee expectations are not dispositive of employer status, they are relevant to our analysis." *Id.* at 728–29 (citing *Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir.1983)).

▮ While the Court must examine the "myriad facts" of plaintiff's employment relationship, some factors have more weight than others. Sole ownership alone is never enough to establish parent liability, *see, e.g., Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1364 (10th Cir.1993), and although no one factor dominates, control over employment carries significant weight. *See Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 994 (6th Cir.1997); *Frank,* 3 F.3d at 1363; *Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 582 (7th Cir.1993). There is also a "strong presumption" that a parent is not the employer of its subsidiary's employees. *Frank,* 3 F.3d at 1362. Indeed, "the courts have found parent corporations to be employers

---

**2.** The Court notes that in *Marzano* the fourth factor—common ownership—would not have been at issue since the case involved a wholly owned subsidiary.

**3.** Courts have applied other tests as well, such as an agency theory, "alter ego" test and "instrumentality" test. In some respects, because the court discusses corporate veil piercing, the Third Circuit's analysis in *Marzano* resembles an application of the "alter ego" test which is often framed as a way of piercing the corporate veil. *See, e.g., Parker v. DPCE, Inc.,* C.A. No. 91–4829, 1992 WL 501273 (E.D.Pa. Nov.3, 1992) (applying ten factor test to determine if a local subsidiary is merely the "alter ego" of its foreign parent in order to decide whether the court had personal jurisdiction over the parent in an employment discrimination case). When referring to New Jersey law, the *Marzano* court also appears, to some extent, to be applying an "instrumentality"

test. *See Marzano,* 91 F.3d at 513 (court may not pierce corporate veil "unless it finds that a 'subsidiary was a "mere instrumentality" of the parent corporation' " (quoting *State of New Jersey v. Ventron Corp.,* 94 N.J. 473, 468 A.2d 150, 164 (N.J.1983))). However, as already stated, the factors examined in *Marzano* are essentially the same as those used in an "integrated enterprise" analysis. In addition, the "integrated enterprise" test is the one most frequently applied by other circuits. *See, e.g., Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 994 (6th Cir.1997); *Frank,* 3 F.3d at 1363; *Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 582 (7th Cir. 1993); *Johnson v. Flowers Industries, Inc.,* 814 F.2d 978, 981 (4th Cir.1987). Finally, it is the test both parties urge this Court to apply. The Court will therefore use the four-factor "integrated enterprise" test.

only in extraordinary circumstances." *Johnson v. Flowers Industries, Inc.,* 814 F.2d 978, 981 (4th Cir.1987). Moreover, it is never sufficient to establish only that a chain of command eventually ends at the parent's headquarters. *See Frank,* 3 F.3d at 1362. If "stockholders were liable whenever they exercised their rightful control, limited liability would be a meaningless fiction because few individuals establish a corporation and then ignore it." *Johnson,* 814 F.2d at 980.

With these principles in mind, the Court turns to the facts in the case at bar.

### 2. Evidence of "Single Employer" Status

■ The parties have produced a voluminous record for the Court's review. While each side places its own spin on the evidence in that record, and the deposition testimony with respect to certain conclusions are occasionally flatly at odds, many of the essential facts are undisputed. To the extent that there is a dispute as to potentially material facts, the Court sets out the disagreement.

### a. Functional Integration of Operations

With respect to integrated operations the parties have offered evidence that:

- IMV employees were enrolled in a benefit plan administered by SSI.
- The office of Mr. Andes was located at SSI headquarters throughout his tenure as Chief Executive Officer of IMV.
- Some purchases for IMV were made through SSI's purchasing department.
- For its first two months, IMV operations were located at SSI and for part of this period IMV had no payroll, federal identification number or bank account. By late March, 1995 IMV had established a federal identification number and set up a general ledger with strict accounting.
- IMV's intra-office phonebook contained entries for SSI employees.
- SSI offered discounted stock in some of its "partnership companies" to the employees of other "partnership companies," including IMV, even though the only common connection between such companies was SSI.
- A vice president of SSI, Rob McCord, worked as a consultant at IMV: he coordinated IMV's work with SSI's other ventures and reported to SSI's CEO about IMV affairs. However, IMV rejected Mr. McCord's suggestion that he act as a "chief of staff type" at IMV and hired him only as a consultant.
- Mr. Andes served on the board of directors of other SSI "partnership companies."
- At least three SSI executives served on IMV's board of directors.
- Warren Musser, CEO of SSI, attended at least two IMV board meetings.
- SSI personnel participated in IMV board meetings although they had no official titles or positions with IMV.
- Plaintiff provided a copy of a letter detailing plans for a joint venture with General Nutrition Centers in which an SSI employee was involved in the negotiations. Plaintiff's App. To Memorandum of Law, Tab 29. (Plaintiff asserts that SSI executives were involved in at least three other such negotiations.)
- From at least January 1995 through May 1995, stationary with an SSI letterhead was used by IMV in dealings with third parties on occasion.
- Bruce Szellyer, a vice president of IMV, had his employment documents processed by SSI. An interoffice memorandum states that this was to make him eligible for SSI benefits, refers to his employment with "Safeguard Marketing Group" and notes that this was a temporary measure until Mr. Andes could arrange "the specifics for the Safeguard Marketing Group." Plaintiff's App. To Memorandum of Law, Tab 42. This occurred during IMV's start-up phase.
- Plaintiff's employment related issues with respect to health care insurance and at least one payroll notice were handled by SSI.
- Before IMV had set up independent accounts, SSI paid IMV's expenses but tracked those expenses independently

without commingling its own expenses with those of IMV.

- Those monies advanced by SSI and recorded on their taxes were transferred to IMV's accounts and federal identification number after those were established by IMV. Defendants' App. A, Tab H, Ex. A.

- Plaintiff received at least some reimbursement for expenses through SSI even after IMV had its own accounting system in place.

- IMV never repaid SSI for any services, nor did it repay any of the management fees charged by SSI, and although accounts were kept separately, not all expenses paid for by SSI were charged back to IMV.

Other facts are disputed and no documentary evidence was provided to supplement the deposition or affidavit testimony of witnesses as to those facts.

IMV invested in two ventures using some of the investment capital provided by SSI.[4] Plaintiff contends that Mr. Andes was required to seek the approval of SSI before he could invest in those other ventures. Mr. Andes responds that the initial investment decision rested entirely with IMV and that when SSI took over those investments, it was in exchange for an extended line of credit. Some of IMV's board members were also SSI officers at the time of these investments, but to the extent they were consulted as to these investments, defendants maintain that it was solely in their capacity as board members of IMV. Defendants further contend that all business expenses advanced by SSI were charged back to IMV and that IMV assumed administrative responsibility for employee benefits programs.

Plaintiff states in her deposition that SSI limited IMV's choice of office equipment suppliers. Defendants contend, however, that IMV was not required to use SSI partners in equipping itself and used its own credit and references for financial and credit applications. Plaintiff refutes this, contending that IMV used SSI's credit references as well as

SSI resources for such services as copying, travel and conference space. SSI, she stated, also serviced IMV's technical and computer needs. As proof, plaintiff submitted two SSI purchase requisitions for computer equipment. Plaintiff's App. to Memo. Of Law, Tabs 26–27. The Court notes that plaintiff also submitted a document entitled "Confidential Financial Information." *Id.* at Tab 25. Plaintiff asserts that this document demonstrates IMV's reliance on SSI's credit references; defendants submitted the identical document, contending that it showed that IMV had its own credit references.

### b. Centralized Control of Labor Relations

Those facts which are undisputed with respect to labor relations are that:

- IMV consulted SSI attorneys regarding the legal consequences of terminating plaintiff.

- Mr. Andes hired all of the "key" personnel and set their compensation. This encompassed all "senior partners"—including plaintiff—and other top management.

- The two principal projects worked on by plaintiff were headed by IMV "senior partners" who were also responsible, along with Mr. Andes, for reviewing her work.

- Plaintiff was removed from projects by Mr. Andes and he decided to terminate her.

- When Hillary Grinker took over as CEO of IMV, she consulted SSI attorneys before initiating a "mass layoff" of IMV "senior partners" in May 1996.

Plaintiff contends that notwithstanding the fact that her complaints center on the actions of IMV officers she reasonably believed that she was employed by SSI since her initial interview was at SSI offices, she flew to her second interview on an SSI jet, and while employed, many of her employment forms and administrative complaints were handled by SSI.

---

4. The two investments at issue were in Educational Marketing Concepts ("EMC") and IMV/Internet.

### c. Common Management

Plaintiff offers little in the way to directly refute the evidence submitted by defendants that IMV was solely responsible for the direct management of its affairs. The defendants' evidence consists primarily of affidavit and deposition testimony of Mr. Andes and other high level officers of IMV. This evidence included the following:

- IMV management was solely responsible for supervision and management of IMV's operations.
- IMV exercised exclusive control over management and "important" personnel decisions.
- The IMV board of directors received periodic status reports, but did not control business operations.
- Mr. Andes developed IMV's management structure.
- Mr. Andes allocated responsibility among management, conducted staff meetings, and reviewed projects and funding.

Plaintiff produced in response a document entitled "Description and Potential," in which there is a statement that "Safeguard's management skills and reputation for outstanding venture management will help IMG [the predecessor name to IMV] find and negotiate with Strategic Partners. Safeguard lends not only credibility and capital, but also specific partnership opportunities. . . ." Plaintiff's App. To Memorandum of Law, Tab 34. Plaintiff also contends: that Mr. McCord's relationship with IMV amounts to common management and control between IMV and SSI; that SSI's CEO, Warren Musser, interceded to resolve a dispute between IMV and Mead Johnson; that Mr. Andes told plaintiff on at least one occasion that he had to answer to SSI; and that all of plaintiff's employment related forms were processed by SSI personnel.[5] Plaintiff did acknowledge, however, that SSI's human resources department did not handle "performance issues."

### d. Common Ownership

It is undisputed that SSI was the sole investor in IMV and that it held a 70% equity interest in the company. SSI's initial investment in IMV was five million dollars and defendants state that because IMV never generated an operating profit, SSI advanced an additional half million dollars to IMV. This happened after IMV made investments in two other companies as described above. Plaintiff argues that these figures, in conjunction with evidence that SSI continued to advance money to IMV even when there was no immediate prospect of IMV turning a profit, amount to an undercapitalization of IMV; thus, plaintiff argues, SSI engaged in deficit financing. *See Johnson v. Flowers Industries, Inc.,* 814 F.2d 978, 981 (4th Cir. 1987) (noting that parent corporation may be liable under ADEA where there is "commingling of funds and assets, the use of the same work force and business offices for both corporations, and the severe undercapitalization of the subsidiary").

### 3. Analysis

The facts adduced by the parties can be summed up as follows: SSI made a substantial investment of venture capital in what turned out to be a risky new business. SSI justified a continuing involvement in IMV's operations—including subsequent investment even though, in hindsight, that seems to have been an unwise decision—by the size of its initial investment. The question for the Court, however, is whether SSI's involvement in IMV was so great that SSI and IMV "in reality, constitute[d] only one integrated enterprise," *Browning–Ferris,* 691 F.2d at 1122, such that the general rule—that shareholders are insulated from the employment decisions of the corporation in which they

---

**5.** In addition to her other arguments, plaintiff notes that in 1996, Mr. Andes was succeeded as CEO of IMV by Hillary Grinker. Ms. Grinker, plaintiff alleges, maintains a personal relationship with Mr. Musser, CEO of SSI, and is also CEO of another SSI partnership company. Plaintiff cites *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983) in which the court held that the fact that relatives of executives of a parent corporation were placed in positions of authority at a subsidiary was relevant to determination of "single employer" status. The Court rejects the analogy between that case and the case at bar. Even assuming a "personal relationship" between Ms. Grinker and Mr. Musser, such a relationship does not rise to the sort of nepotism—the placing of relatives—which might justify a finding of "single employer" status.

hold stock—should be breached in this case. The Court concludes that it should not; there has been no demonstration sufficient to pierce the corporate veil and SSI and IMV will not, therefore, be treated as a "single employer."

### a. Functional Integration of Operations

Given its sizeable investment, SSI took an active interest in the operation and activities of IMV. Thus there was evidence of some interrelationship in the administration of SSI and IMV, particularly when IMV was starting up. For its first few months of operation, IMV had almost no corporate existence independent of SSI: SSI administered IMV's employee benefits, payroll and tax matters, and IMV depended in part on SSI's reputation in building its business. This dependence included using SSI stationary for IMV communications with outside parties.

Nonetheless, even when paying IMV's expenses directly, the evidence shows that SSI maintained distinct accounts and the Court concludes that the facts do not demonstrate the "extraordinary circumstances," *Johnson,* 814 F.2d at 981, necessary to find that a parent corporation is the employer of its subsidiary's employees. Even assuming that plaintiff is correct with respect to those facts that remain disputed (for instance, that IMV used credit references provided by SSI and could contract only with SSI approved equipment suppliers) the Court's conclusion does not change. Likewise, even if plaintiff's contention that IMV was required to obtain SSI approval before making large expenditures (e.g., equipment purchases) and before making two investments is correct, it does not justify piercing the corporate veil. *See Fletcher v. Atex,* 68 F.3d 1451, 1459–60 (2d Cir.1995) (affirming grant of summary judgment for defendant in product liability case and holding that under Delaware corporate law fact that parent's approval was required for "real estate leases [and] major capital expenditures" did not "raise an issue of material fact about whether the two corporations constituted a 'single economic entity' "). At most what has been shown is that a majority stockholder and sole investor took an active interest in getting its investment off the ground.

Plaintiff claims that Mr. Andes "answered to" SSI, but this too would not demonstrate a degree of interrelationship sufficient to pierce the corporate veil, for "the power to control comes with ownership." *Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 582 (7th Cir.1993); *see also Johnson,* 814 F.2d at 982 ("Nor does the exercise of 'oversight' permit disregard of the incidents of separate corporate entities."). SSI's interest is also reflected in part by the presence of SSI officers on IMV's board, but interrelated boards also do not sufficiently demonstrate that two corporations are a "single employer." *See, e.g., Johnson,* 814 F.2d at 982; *Beckwith v. Internat'l Mill Services, Inc.,* 617 F.Supp. 187, 189 (E.D.Pa.1985) (holding that fact "that the Executive Vice President of the parent corporation is also the Chairman of the Board" of the subsidiary does not show structural integration).

### b. Centralized Control of Labor Relations

Of more importance to this analysis, there is simply no evidence that SSI interfered or participated in the hiring decisions of IMV or in other forms of labor relations. To satisfy the "centralized control of labor" prong of the "integrated enterprises" test, "a parent must control the day to day employment decisions of the subsidiary." *Frank,* 3 F.3d at 1363 (citing *Armbruster,* 711 F.2d at 1338–39 (6th Cir.1983)). That SSI handled the payroll at one point is insufficient proof of an interrelationship. *See Marzano,* 91 F.3d at 514. While plaintiff's apparent belief that SSI was her ultimate employer carries some weight, it is not dispositive, *see Graves,* 117 F.3d at 729; *Daliessio v. Depuy,* C.A. No. 96–5295, 1998 WL 24330, *5 (E.D.Pa.1998), and in light of all of the evidence, her belief, reasonable or not, must give way to the facts presented by defendants. That evidence simply does not show, with respect to employment decisions, that SSI exercised "a degree of control that exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary entity." *Armbruster v. Quinn,* 711 F.2d 1332, 1338 (6th Cir.1983).

### c. Common Management

There is, additionally, no evidence that any SSI manager also acted as a manager at IMV. Even had there been such evidence, the fact that two corporations share a manager is insufficient evidence of an integrated enterprise, see *Frank*, 3 F.3d at 1364. The closest plaintiff has come to demonstrating common management is evidence that Mr. McCord served as an IMV consultant and was also a vice president at SSI. Rather than demonstrating that the management of SSI and IMV were highly intertwined, however, the facts adduced demonstrate that IMV's management exercised considerable autonomy: Mr. Andes *rejected* Mr. McCord's suggestion that he serve as a "chief of staff type" at IMV, despite the fact that Mr. McCord was a vice president at SSI. Moreover, "the fact that one of parent's employees is an occasional consultant on [a] project" is not evidence of interrelated operations. *Frank*, 3 F.3d at 1362–63.

### d. Common Ownership

As in *Marzano*, common ownership is not at issue in this case for it is undisputed that SSI was the majority stakeholder in IMV. Thus, there is common ownership.

### e. Conclusion

Examining all four factors of the "integrated enterprise" test together in the light most favorable to plaintiff, the Court concludes that plaintiff has not established a genuine issue of material fact sufficient to overcome the "strong presumption" that SSI, as the parent corporation, was not her employer. *See Frank*, 3 F.3d at 1364 (citing *Johnson*, 814 F.2d at 981). Accordingly, the Court will grant SSI's motion for summary judgment as to the question of whether SSI and IMV were a "single employer."

### C. Was There an Implied Employment Contract?

In Count III of her complaint, plaintiff alleges that the nature of her employment agreement created a contract which allowed her to be terminated only for "good cause." She further states that she was promised an annual salary of $ 220,000, an equity interest in IMV, and a position as CEO of an as-yet-to-be-created marketing company, none of which she received. Defendants move for partial summary judgment on the ground that plaintiff has not produced facts sufficient to overcome the presumption in Pennsylvania that absent a clear agreement, employment is at-will.

At the outset of this discussion, the Court notes that plaintiff's count sounding in breach of contract contains two different types of contract claims. Plaintiff is alleging the existence of an express contract when she claims she was promised a certain salary and benefits in exchange for her work. She also alleges an implied term of that express contract when she states that her employment was to be terminated only for "good cause." This distinction is important because the two claims are governed by different standards. Under Pennsylvania law, it is the plaintiff's "burden to establish the existence of an oral contract by 'clear and precise' evidence." *Browne v. Maxfield*, 663 F.Supp. 1193, 1197 (E.D.Pa.1987). A contract is enforceable only if both parties "manifested an intent to be bound, it is supported on both sides by consideration, and its terms are sufficiently definite." *Gorwara v. AEL Industries, Inc.*, 784 F.Supp. 239, 242 (E.D.Pa. 1992). This burden is different in degree than the significant hurdle of overcoming the presumption that an employment agreement is terminable at-will by either party. Defendants' Motion for Partial Summary Judgment addresses only the question of whether there was an implied term of an express contract; the Court will not, therefore, discuss the merits of plaintiff's other contract claims.

### 1. Employment At–Will

"As a general rule in Pennsylvania, employees are considered to be at-will, and may be terminated at any time.... To rebut the presumption of at-will employment, [a plaintiff] must establish the existence of: (1) sufficient additional consideration; (2) an agreement for a definite duration; (3) an agreement specifying that the employee will be discharged only for just cause; or (4) an applicable recognized public policy exception." *Geiger v. AT & T Corp.*, 962 F.Supp.

**369**

637, 648 (E.D.Pa.1997) (citing *Robertson v. Atlantic Richfield Petroleum Products Co.*, 371 Pa.Super. 49, 537 A.2d 814, 819 (1987), *appeal denied*, 520 Pa. 590, 551 A.2d 216 (1988)) (holding that acceptance of early retirement in exchange for promise of work as consultant was not sufficient "additional consideration" to overcome at-will presumption); *see also Scott v. Extracorporeal, Inc.*, 376 Pa.Super. 90, 545 A.2d 334 (Pa.Super.1988) (listing factors which can be proved to overcome presumption as (1) express contract, (2) implied in-fact contract, (3) additional consideration or (4) contravention of a clear public policy or specific intent to harm the employee). The burden of overcoming the presumption and proving that one is not employed at-will "rests squarely" with the employee. *See Rutherfoord v. Presbyterian–University Hospital*, 417 Pa.Super. 316, 612 A.2d 500, 503 (Pa.Super.1992). Plaintiff argues that she has met her burden and can sufficiently rebut the presumption of at-will employment first, by proving that she supplied "additional consideration" and second, that, in order to induce her to accept employment, IMV made promises from which it can be inferred that a long-term employment relationship was intended.

▬▬▬ The law with respect to plaintiff's first contention—that she supplied additional consideration—is well established in Pennsylvania. An extensive analysis of the requirements of "additional consideration" in employment contract disputes is set forth in *Darlington v. General Electric*, 350 Pa.Super. 183, 504 A.2d 306 (Pa.Super.1986), *overruled on other grounds, Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 559 A.2d 917 (Pa.1989). Additional consideration is found "when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a

substantial hardship other than the services which he is hired to perform." *Id.* at 315.[6] While the existence of additional consideration is a question of fact, and thus for the jury to decide,

> the court may answer questions of fact and contract interpretation when the "evidence is so clear that no reasonable man would determine the issue before the court in any way but one...." *Darlington*, 504 A.2d at 312.... [T]he courts have given a narrow reading to "additional consideration," generally requiring a showing of some "extraordinary detriment or ... extraordinary benefit" before allowing the question to reach the jury. *Darlington*, 504 A.2d at 315; *see Duvall v. Polymer Corp.*, 1995 WL 581910, at *17 (foregone offers of employment from other companies not substantial hardship); *Cashdollar v. Mercy Hospital*, 406 Pa.Super. 606, 595 A.2d 70, 73–74 (1991) (upholding verdict of substantial hardship when "special circumstances" of plaintiff selling his house, uprooting his pregnant wife and child to move to new state for new job, from which he was fired after sixteen days); *Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571, 580 (1986), *appeal denied*, 532 Pa. 665, 616 A.2d 986 (1992) (no substantial hardship when the detriments are "commensurate with those incurred by all manner of salaried professionals").

*Geiger*, 962 F.Supp. at 649. In analyzing this type of claim, a fact finder need not conclude that the parties reached an actual agreement as to a definite term of employment in order to find that plaintiff has overcome the at-will presumption; if sufficient additional consideration is present, an agreement will be inferred. *See Darlington*, 504 A.2d at 314. With this in mind, the Court turns to the facts presented by the parties.

**6.** In *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90 (3d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977), it was held that evidence that plaintiff, a representative of furniture manufacturers, chose to represent only one manufacturer (thereby giving up representation of others) and also personally guaranteed the creditworthiness of accounts he solicited, was sufficient proof of additional consideration to overcome the at-will presumption.

A later case, *Engstrom v. John Nuveen & Co., Inc.*, 668 F.Supp. 953, 961 (E.D.Pa.1987), held that *Bravman's* holding requires a plaintiff to prove there was *both* a substantial detriment to the employee and a substantial additional benefit to the employer. In light of the clear use of the conjunction "or" in the lead case, *Darlington*, the Court believes, however, that proof of *either* substantial detriment *or* additional benefits is sufficient.

Plaintiff argues that she supplied "additional consideration" because she suffered a "substantial detriment" when required to abandon her consulting business. As a result of that abandonment, she contends, she lost the years of work she had invested and the good will she had accumulated in her business. The facts demonstrate that by the end of 1994, she was on retainer to two clients who were paying her $9,000 a month for her services and that after expenses, her 1994 net taxable income was $5,455. In connection with plaintiff's argument, the Court notes that in an unsigned and undated IMV document entitled "NITA MARTIN—Proposed Action," which discusses the strategy for terminating plaintiff, under the heading "to be determined," it is asked, "Can [plaintiff] claim she was 'induced' to give up a thriving consulting business to join IMV?" Plaintiff's Appendix to Memo. in Opposition, Tab 41.

In addition to the detriment plaintiff suffered in abandoning her business, plaintiff asserts that she was promised a package of incentives which induced her to accept a position as a "senior partner" at IMV. Those were:

(1) the promise that she would be given an equity stake in "the business";

(2) the promise that she would "have a share in" all IMV ventures; and

(3) the promise that she would be named CEO of a new company specializing in the marketing of collectibles.

In this connection, Mr. Andes testified that as part of plaintiff's compensation "there was to be an equity participation." July 1, 1997 Deposition of Charles Andes at 51. Plaintiff testified in addition that she and Mr. Andes discussed that she "would have an equity interest as a founding partner of [a collectible business] and as CEO [of that business]." Deposition dated May 20, 1997 of Juanita Martin. A document from Mr. Andes to plaintiff—suggesting that he and plaintiff "tentatively plan that you [plaintiff] should delay commencement of the Collectibles Business Plan development . . .," Plaintiff's Appendix to Memo. of Law, Tab 32—is not inconsistent with plaintiff's testimony.

Plaintiff argues that the abandonment of her consulting business was a substantial hardship and is sufficient proof of additional consideration. In response, defendants contend that plaintiff's business had so little taxable income that abandoning it presented no significant detriment to plaintiff. The Court concludes, however, that there is a genuine issue of material fact as to whether plaintiff suffered a substantial hardship in leaving her consulting business. That said, the evidence of the value of plaintiff's business income, and of her good will in the business community, is for the jury to evaluate.

This does not answer the question at issue, however—whether that evidence, if believed, is sufficient as a matter of law to overcome the at-will presumption. Plaintiff analogizes her position to those of employees who are forced to relocate over substantial distances. In such cases, courts have frequently held that such a move is "additional consideration" sufficient to overcome the at-will presumption. *See, e.g., News Printing Co., Inc. v. Roundy*, 409 Pa.Super. 64, 597 A.2d 662 (Pa.Super.1991) (holding that there was sufficient additional consideration where employee quit job, turned down another offer and relocated his family from Massachusetts to Pennsylvania); *Cashdollar v. Mercy Hospital of Pittsburgh*, 406 Pa.Super. 606, 595 A.2d 70 (Pa.Super.1991) (holding evidence employee sold his home in Virginia to move to Pennsylvania, uprooted his family and quit a lucrative job was sufficient to overcome at-will presumption).

This case, of course, does not involve a move, and normally, simply foregoing one employment opportunity in favor of another is not, in itself, a sufficient hardship, but is instead "simply a reasoned choice of a new career opportunity." *Darlington*, 504 A.2d at 315; *see also Engstrom*, 668 F.Supp. at 960 ("Foregoing other employment opportunities is not the 'additional consideration' sufficient to overcome the presumption of employment at-will under Pennsylvania law because every employee who remains employed at one job foregoes the opportunity to work elsewhere.") (citing *Lightcap v. Keaggy*, 128 Pa.Super. 348, 194 A. 347, 351–52

(1937)). However, plaintiff in this case argues that she did not simply exchange employers, she abandoned a business. Whether such abandonment, standing alone, would be a substantial detriment sufficient to overcome the at-will presumption is a question the Court need not address, for plaintiff has presented other evidence as well. *Cf. Marshall v. Dunwoody Village*, 782 F.Supp. 1034 (E.D.Pa.1992) (granting summary judgment for employer where employee was allegedly given a verbal commitment of long-term employment and where employee also gave up a personal real estate practice when he accepted his new job because such facts did not overcome the at-will presumption).

For instance, plaintiff has provided evidence that by abandoning her growing business, her good will was damaged or destroyed in the community of business colleagues with whom she had worked. Because of this, a jury might conclude that the defendants knew that firing plaintiff would work a great hardship on her, for she could not simply return to her consulting business. In examining whether an employee has suffered a substantial detriment, one factor a court may consider is whether " 'a termination of the relation by one party will result in great hardship or loss to the other, as they must have known it would when they made the contract....' " *Darlington*, 504 A.2d at 315 (quoting 3 A. Corbin, *Corbin on Contracts* § 684 (1960)). This factor can be " 'of great weight in inducing a holding that the parties agreed upon a specific period.' " *Id.* Thus, this evidence weighs in favor of finding that a reasonable jury could conclude that plaintiff has overcome the at-will presumption.

More importantly, however, plaintiff has presented evidence that she was promised certain incentives for accepting a position at IMV. The Court concludes that there is a genuine issue of material fact with respect to the promises that plaintiff would be given an equity stake in IMV and would head a new venture. Although such promises by themselves might not be sufficient to overcome the presumption of at-will employment—because "definiteness is required to overcome the at-will presumption ... [and][c]ourts are highly reluctant to make definite that which the parties themselves failed to do," *Darlington*, 504 A.2d at 312—the Court need not decide that question because of the additional evidence provided by plaintiff.

After examining all of the facts presented—that plaintiff abandoned a growing business and its accumulated good will, coupled with the promise of an equity interest in IMV's ventures and the promise that plaintiff would participate as a CEO in another new venture—the Court concludes that a jury could find that the at-will presumption has been overcome, and that the parties intended that employment continue for a "reasonable time." *See Marsh v. Boyle*, 366 Pa.Super. 1, 530 A.2d 491, 494 (Pa.Super.1987) ("When the exact period for which the parties intended to contract is unable to be determined, an agreement for a 'reasonable time' will be inferred." (citation omitted)).[7] The Court, therefore, will deny summary judgment on plaintiff's contract claim.

### D. Can Plaintiff Recover Damages for the Period After May 1996?

██ Defendants argue that there was a "mass layoff" of senior partners in May 1996 and thus, plaintiff cannot recover damages for any period after May 1996. Even if the Court concludes that she can recover damages after that time, defendants claim that IMV ceased operating in August 1997, and that that would therefore be the latest period for which plaintiff can recover damages. The Court disagrees. "It is well settled that '[t]he risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim.' " *Bartek v. Urban Redevelopment Authority of Pittsburgh*, 882 F.2d 739, 746 (3d Cir.1989) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 889 (3d Cir.1984) (hearing appeal in Title VII case)) (holding also that "the victim has the initial burden of identifying those posi-

---

7. In their Reply Memorandum, defendants suggest that seven months of employment at IMV is a "reasonable time," but the Court concludes that in light of the promise that plaintiff would receive an equity share in IMV, a jury could find that seven months was not reasonable.

tions upon which an award of damages is to be based"). Because there is evidence in the record that other senior partners continued to earn income from IMV in various capacities after the "mass layoff" (and even after August 1997 when IMV purportedly ceased functioning), the Court concludes that there is a genuine issue of material fact and will therefore deny summary judgment on this ground.

### E. Intentional Infliction of Emotional Distress Claim Has Been Voluntarily Withdrawn

Plaintiff has voluntarily withdrawn Count IV of her Complaint, alleging a common law claim of intentional infliction of emotional distress. She withdraws this claim, however, "subject to" her right to recover for emotional distress under Title VII (Count I) and under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.S.C.A. §§ 951, *et seq.* (Count II). Because plaintiff may recover damages for her emotional distress, absent proof of outrageous conduct, under both Title VII, *see* 42 U.S.C. § 1981a(b) (providing, *inter alia,* that a plaintiff in an intentional discrimination suit under Title VII can recover a limited amount of "compensatory damages" which may include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses"), and the PHRA, *see Clarke v. Whitney,* 975 F.Supp. 754, 758 (E.D.Pa.1997) (" '[l]egal and equitable relief' includes damages for humiliation and mental anguish' ") (quoting *Pennsylvania Human Relations Comm'n v. Zamantakis,* 478 Pa. 454, 387 A.2d 70, 73 (Pa.1978)), plaintiff's conditional withdrawal of Count IV of her Complaint is not inappropriate. Defendants' motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress will therefore be denied as moot.

### III CONCLUSION

For all of the foregoing reasons, defendants' Motion for Partial Summary Judgment will be granted with respect to plaintiff's claim that IMV and SSI were a "single employer." In all other respects, defendants' Motion will be denied.