**Gerald N. McGOUGH and Matthew J. Haviland, Plaintiffs,**

v.

**BROADWING COMMUNICATIONS, INC., Defendants.**

**No. 00–6206 (JEI).**

United States District Court, D. New Jersey.

Dec. 21, 2001.

Frank & Rosen by Alan L. Frank, Cherry Hill, NJ, for Plaintiffs.

Littler Mendelson by Joanne M. Maxwell, Morristown, NJ, for Defendant.

## OPINION

IRENAS, District Judge.

Plaintiffs Gerald McGough ("McGough") and Matthew Haviland ("Haviland") filed the instant suit against their former employer, Broadwing Communications, Inc. ("Broadwing"), seeking recovery of allegedly unpaid commissions and bonuses. The Complaint asserts claims for breach of contract, promissory estoppel, unjust enrichment, as well as for violations of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et. seq. ("WPCL"), and the Pennsylvania Commissioned Sales Representatives Act, 43 P.S. § 1471 et. seq ("CSRA"). Finally, Plaintiffs also bring a cause of action for an accounting of those commissions which they allege remain due and owing. Presently before the Court is Defendant Broadwing Communications, Inc.'s Motion to Dismiss Counts IV (WPCL), V (CSRA), and VI (Accounting) of Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(6). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. For the reasons set forth below, Defendant's motion to dismiss will be granted in part and denied in part.

I.

Plaintiffs Gerald N. McGough and Mathew J. Haviland are former employees of Defendant Broadwing Communications, Inc., a provider of telecommunications services doing business throughout the United States. Plaintiffs were originally hired by Broadwing's predecessor, IXC Communications, on or about August 30, 1998, and employed in the company's retail sales division, Eclipse Telecommunications ("Eclipse"). (Compl. at ¶¶ 9–11). Plaintiff McGough assumed a position as a regional sales director and Plaintiff Haviland was employed as a branch manager. Id. According to the complaint, as compensation for their work, Plaintiffs were paid a base salary plus commissions. (Compl. at ¶ 12). As a branch manager, Haviland was allegedly entitled to commissions on each sale by a sales person in his branch (referred to as "override commissions"). (Compl. at ¶ 16). In his position as sales director, McGough was similarly entitled to override commissions on all sales within all branches in his region. (Compl. at ¶ 17).

On or around November 15, 1999, Defendant Broadwing acquired IXC Communications. (Compl. at ¶ 8). Following the acquisition, Broadwing began implementation of a variety of changes with respect to the compensation of sales managers. Broadwing initially published and distributed a document entitled "Broadwing Communications, Inc. Sales Compensation Plan for Branch Sales Manager" ("Compensation Plan") which was to become effective beginning April 1, 2000. (Compl. at ¶ 20). Under the original Compensation Plan, commissions were to be calculated based on a customer's third month of billing following the implementation of telecommunications services. However, according to the complaint, while attending a Branch Sales Managers' Summit in Dallas, Texas, hosted by Broadwing, Plaintiffs

were allegedly "informed that the Compensation Plans Company–Wide, were not being followed. They were further informed that several changes had already been implemented and others might yet be introduced." (Compl. at ¶ 21). Plaintiff McGough was informed, for instance, that the formula for calculating override commissions had been modified so that managers' commissions from sales were being determined on the basis of a customer's first rather than the third month of billing. (Comp. at ¶ 22). According to Plaintiffs, Broadwing did not publish or distribute a new Compensation Plan detailing the changes which had apparently been made. (Compl. at ¶ 24). Sums earned on commission were simply deposited in Plaintiffs' accounts and no detailed statement of sales commissions was ever provided. (Compl. at ¶ 25).

In addition to override sales commissions, the Complaint further alleges that "after the acquisition of Broadwing, certain key employees, including Plaintiffs, were promised management bonuses." (Compl. at ¶ 27). Correspondence dated September 22, 1999 and addressed to Plaintiff Haviland is attached to Plaintiffs' complaint as an exhibit and is purported to set forth the basis for these management bonuses. The letter reads in relevant part:

> Mathew [Haviland], you are an essential member of the "NewCo" team. As such, you are eligible for special compensation for your role in establishing the new company. If you are an active employee on May 19, 2000, you will receive $6,468.80. If you are an active employee on November 17, 2000 you will receive $6,468.80.

(Compl. at Exhibit Exhibit D). The complaint suggests that Plaintiff McGough received a similar letter promising two separate bonuses of $10,143.00 should he remain an active employee of the company on each of same two respective dates. (Compl. at ¶¶ 27–29). Both McGough and Haviland were each paid the "first half" of this management bonus on or about May 19, 2000. (Compl. at ¶ 28).

Following Broadwing's acquisition of IXC Communications, Plaintiffs were retained in their original positions as employees of the retail sales division until October 30, 2000. On that date, both McGough and Haviland were informed that their employment with the company was being terminated. (Compl. at ¶¶ 13–15). Plaintiffs were allegedly reassured that they would each receive the salary and commissions owed to them for services rendered through October 31, 2000. *Id.* However, they were also informed that the "second half" of their management bonuses due on November 17, 2000, would not be paid. (Compl. at ¶ 29).

Following their termination, Plaintiffs filed the instant suit seeking to recover unpaid commissions and a variety of bonuses for services provided prior to their termination.[1] Plaintiffs' complaint asserts several causes of action. Counts I through III assert claims for breach of contract, promissory estoppel, and unjust enrichment. Counts IV and V seek recovery based on alleged violations of Pennsylvania Wage Payment and Collection Law ("WPCL") and the Pennsylvania Commissioned Sales Representatives Act ("CSRA"), respectively. Finally, under Count VI of the complaint, Plaintiffs seek an itemized accounting of the commission

---

1. In addition to seeking recovery of the second installment of these "management bonuses," the complaint further seeks recovery of certain performance-based "quarterly bonus-es" and stock option rewards to which Plaintiffs' were allegedly entitled upon the termination of their employment. (Compl. at ¶ 30–35).

payments which remain outstanding. Defendant's motion to dismiss under F.R. Civ. P. 12(b)(6) is limited to Counts IV through VI of Plaintiffs' complaint.

## II.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In resolving a Rule 12(b)(6) motion, the court primarily considers allegations in the complaint, although matters of public record, orders, items appearing in the record of the case and exhibits attached to the complaint may also be taken into account. *See Chester County Intermediate Unit v. Pennsylvania Blue Shield*, 896 F.2d 808, 812 (3d Cir.1990). In doing so, the court must accept as true all of the factual allegations contained in the complaint and any reasonable inferences that can be drawn therefrom. *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that is has not alleged." *Associated General Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Finally, when "confronted with such a motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

## A.

In Count IV of the complaint, Plaintiffs seek to recover unpaid commissions and bonuses under the Pennsylvania Wage Payment and Collection Law, 43 Pa. Stat. Ann. § 260.1, et seq. (West 1992) ("WPCL").[2] The WPCL does not create any substantive statutory right to wages or other forms of compensation; rather, it merely provides a statutory vehicle for employees to recover earned wages from an employer who has breached an underlying contractual obligation to provide such compensation. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir.1990). The basic purpose of the WPCL is "to remove some of the obstacles employees face in. litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages." *Hartman v. Baker*, 766 A.2d 347, 352 (Pa.Super.2000) (quoting *Oberneder v. Link Computer Corp.*, 449 Pa.Super. 528, 528, 674 A.2d 720 (1996), affirmed, 548 Pa. 201, 696 A.2d 148 (1997)). In addition to providing for the recovery of earned but unremitted compensation, the statute per-

**2.** Under the WPCL, wages or compensation "earned" by an employee and wrongfully withheld by the employer are due to the employee upon termination. The statute reads in pertinent part:

Whenever an employer separates an employee from the payroll, or whenever an employee quits or resigns from his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

43 P.S. § 260.5. "Wages" are defined broadly as "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term ... also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employee's pay by the employer." 43 P.S. § 260.2a.

mits an employee whose earned wages remain unpaid for a specified period of time to recover exemplary damages where "no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for non-payment." 43 P.S. § 260.10.[3]

In examining the legal sufficiency of Plaintiffs' pleadings, the threshold question is whether Plaintiffs have alleged facts sufficient to state a claim for breach of a pre-existing contractual obligation to compensate them for services rendered prior the date their employment was terminated.[4] Defendants contend that Plaintiffs' claimed contractual entitlement to override commissions is based entirely on the terms of the original Compensation Plan which Broadwing promulgated as part of its effort to modify the terms of compensation for upper sales managers following its acquisition of Plaintiffs' former employer, IXC Communications. The Plan contains the following disclaimer, expressly disavowing any intent to enter into a binding contractual relationship:

This Plan is a statement of the Company's current policy on incentive compensation. It is not a contract and does not give the manager any legal rights to receive compensation thereunder nor does it serve to alter the manager's employment relationship with the Company or any of its affiliates as an at-will employee. No legal rights accrue under the Plan with respect to compensation until such time as compensation is actually paid. The Company may modify or terminate the Plan at any time or without notice. Further, the Company reserves the right to review and modify quotas and commission rates and terms and conditions of payment with or without notice in general or based upon the special terms and conditions for any order.

(Compl. at Exhibit A.) (emphasis added). Defendants are correct in maintaining that this Compensation Plan, which is attached to the Complaint as an exhibit, does not in and of itself alter the Plaintiffs' status as at-will employees. *See Herbst v. General Accident Insurance Company,* 1999 WL 820194 (E.D.Pa.1999); *Anderson v. Haverford College,* 851 F.Supp. 179, 181 (E.D.Pa. 1994); *Raines v. Haverford College,* 849 F.Supp. 1009 (E.D.Pa.1994).[5] Plaintiffs'

---

**3.** The relevant liquidated damages provision of the WPCL provides as follows:

where wages remain unpaid for thirty (30) days beyond the regularly scheduled pay day, or, in the case where no regularly scheduled pay day is applicable, for sixty (60) days beyond the filing by the employee of a proper claim or for sixty (60) days beyond the date of the agreement, award or other act making wages payable, or where shortages in the wage payments made exceed five (5%) percent of the gross wages payable on any two regularly scheduled pay days in the same calendar quarter, and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for non-payment, the employee shall be entitled to claim, in addition, as liquidated damages in an amount equal to twenty-five (25%) percent of the total amount of wages due.
43 P.S. § 260.10.

**4.** As this analysis suggests, Plaintiffs' claim under the WPCL is inextricably linked to Plaintiffs' breach of contract claim. The Court observes that Defendant's have not, however, sought to dismiss Plaintiffs' underlying breach of contract claim for failure to state a legally sufficient cause of action.

**5.** Under Pennsylvania law, in order to rebut the presumption of at-will employment, a plaintiff must establish the existence of additional consideration other than the services he was engaged to perform, an agreement for a definite duration, or an agreement specifying he will be discharged only for just cause. *See Herbst v. General Accident Insurance Company,* 1999 WL 820194 at *8 (E.D.Pa.1999). A

status as at-will employees, which appears to be undisputed, does not, however, excuse Defendant Broadwing from providing compensation for services rendered prior to their termination. The presumption of at-will employment confers a legal status upon employees hired for an undefined term of employment which addresses a particular aspect of the employment relationship-the ability of both employer and employee to terminate their employment relationship at any time without explanation or cause. *See Herbst,* 1999 WL 820194 at *8; *Ruzicki v. Catholic Cemeteries,* 416 Pa.Super. 37, 610 A.2d 495, 497 (1992). The doctrine does not, however, address other aspects of the employment arrangement, such as issues regarding the promised form and amount of compensation for work completed prior to an employee's termination. *See Kotlinski v. Mortgage America, Inc.* 40 F.Supp.2d 298, 307 (W.D.Pa.1998); *see also Martin v. Safeguard Scientifics, Inc.,* 17 F.Supp.2d 357, 368 (E.D.Pa.1998). While an employer may permissibly discharge an at-will employee at any time with or without cause, the doctrine does not relieve an employer of its contractual obligation to provide the compensation promised in return for an employees services. Moreover, while the language of the Plan's disclaimer may reserve Broadwing's right to alter the nature and extent of Plaintiffs' compensation for future services, it cannot and does not permit Broadwing to retroactively modify the terms of Plaintiffs' compensation for work performed prior to such modifications.

In any event, Plaintiffs' allegations of a legally enforceable entitlement to commissions do not depend entirely on this document. Plaintiffs allege the existence of a separate oral agreement, claiming that they were promised a certain base salary plus commission in exchange for their performance of certain services rendered in their positions as sales managers. The Compensation Plan, Plaintiffs contend, if not a binding contractual document itself, is at least evidence of the nature and terms of this arrangement. While the perfunctory pleadings of Plaintiffs' complaint do not specifically allege the existence of such an oral contract, the existence of a binding contractual arrangement with respect to the nature and extent of the compensation promised in exchange for the services rendered by Plaintiffs prior to their termination can be implied from several of the allegations.

■ An express contract is formed when the terms of an agreement are declared by the parties either verbally or in writing. However, even where no such clear declaration exists, a contract may nevertheless be implied-in-fact. A contract implied-in-fact is an actual contract which arises when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances. *See Halstead v. Motorcycle Safety Foundation, Inc.,* 71 F.Supp.2d 455 (E.D.Pa.1999).[6] An

document such as the Compensation Plan promulgated by Broadwing is only enforceable as a contract modifying an employees "at-will" status "if a reasonable person in the same position as the employee would interpret its provisions as evidencing an intent by the employer to overcome the at-will presumption." *Anderson,* 851 F.Supp. at 181. Courts have consistently held that, under

Pennsylvania law, the existence of a disclaimer expressly disavowing any intent to contract are sufficient to retain the at-will presumption. *See id.* at 182.

6. Defendants do not suggest that averment of an express contract is necessary to state a valid cause of action under the WPCL. As case law suggests, the statute merely requires

offer and acceptance need not be identifiable and the moment of formation need not be precisely pinpointed. *See Ingrassia Construction Co., Inc. v. Walsh,* 337 Pa.Super. 58, 67, 486 A.2d 478 (1984). In general, there is "an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary." *Martin v. Little, Brown and Company,* 304 Pa.Super. 424, 429, 450 A.2d 984 (1981). As one Pennsylvania court has explained, "a promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service." *Id.* at 430, 450 A.2d 984 (citing *Home Protection Building & Loan Association,* 143 Pa.Super. 96, 98, 17 A.2d 755 (1941) and 12 Amer.Jur.Contracts, § 5). However, a promise to pay for services can only be implied, however, in circumstances under which the party rendering the services would be justified in entertaining a reasonable expectation of being compensated by the party receiving the benefit of those services. *Id.*

Here, the existence of a binding contractual relationship between Plaintiffs and Defendant with respect to the nature and extent of compensation for services rendered prior to their termination can be implied from Plaintiffs' averments regarding the relationship between the parties and the Defendant's conduct over the course of Plaintiffs' employment. The complaint alleges very simply that Plaintiffs were employed as sales managers to help direct company efforts to solicit customers interested in purchasing telecommunications services. In their positions as sales managers first with IXC Communications and subsequently with Defendant Broadwing, Plaintiffs allegedly received compensation for their work in the form of a base salary plus commissions. Defendant Broadwing knowingly availed itself of the services rendered by Plaintiffs prior to their termination and, indeed, allegedly reassured them that they would be compensated for those services. Under the circumstances, in light of the employment relationship between parties and the Defendant's remittance of compensation in the form of wages and commissions over the course of Plaintiffs' employment with the company, it was clearly reasonable for Plaintiffs to expect that Defendant would similarly compensate them for the work performed prior to the date they were discharged. Accordingly, Plaintiffs sufficiently alleged the existence of an implied contract with regard to the nature and amount of the compensation promised to them in exchange for services rendered prior to the date of separation.[7] Plaintiffs further allege that Defendant Broadwing continues to improperly withhold such compensation "without good reason" beyond the time period prescribed by the WPCL. The Court therefore concludes that the pleadings, while lacking in significant detail, are sufficient to survive a

the existence of a binding legal duty upon the employer to provide the compensation sought by the complainant. Under Pennsylvania law, a contract implied-in-fact "has the same legal effect as any other contract" and "differs from an express contract only in the manner of its formation." *Ingrassia Construction Co., Inc. v. Walsh,* 337 Pa.Super. 58, 67 n. 7, 486 A.2d 478 (1984).

7. The dispute over the significance and effect of the Compensation Plan and any subsequent efforts by Broadwing to modify the terms of Plaintiffs' compensation is relevant to the issue as to the precise form and amount of compensation to which Plaintiffs' are legally entitled to for any services provided prior to their termination. The Court need not address this issue for purposes of this motion.

12(b)(6) motion to dismiss for failure to state a claim for recovery of unpaid wages and commissions under the WPCL.

 The Court, however, reaches a different conclusion with respect to certain bonuses Plaintiffs' seek to recover. The complaint alleges that, during Broadwing's acquisition of IXC Communications, Plaintiffs original employer, certain key employees, including Plaintiffs, were promised certain management bonuses. Plaintiffs attach to their complaint a copy of a letter sent to Plaintiff Haviland which they allege sets forth the basis for these management bonuses. The relevant portion of this letter reads as follows:

> Mathew [Haviland], you are an essential member of the "NewCo" team. As such, you are *eligible* for special compensation for your role in establishing the new company. *If you are an active employee on May 19, 2000, you will receive, $6,468.80. If you are an active employee on November 17, 2000 you will receive $6,468.80.*

(Compl. at Exhibit D) (emphasis added). The complaint alleges that Plaintiff McGough was sent a similar letter explaining his eligibility for a bonus in the amount of $10,143 on each of the designated dates. Both Haviland and McGough were paid their respective bonuses on May 19, 2000. However, Plaintiffs' employment was subsequently terminated on or about October 31, 2000, prior to the date on which the second management bonus was to be disbursed. Plaintiffs were not paid management bonuses on November 17, 2000 or anytime thereafter.

 In the absence of bad faith or duress, "parties to a contract are generally free to impose whatever conditions they may choose upon their contractual undertakings, the performance of which is essential before they become bound by the agreement." Williston on Contracts

§ 38:2 (2000). A conditional promise qualifies a promisor's duty to perform. Where a party's promise is expressly made dependent on the existence of a stated condition, unless "waived, excused, or prevented by the other party" such a condition must generally be "literally met or exactly fulfilled" before any binding contractual liability can arise. Williston on Contracts § 38:6. As the text of the attached letter makes clear, the promised bonuses were expressly conditioned on Plaintiffs remaining "active employees" on certain specified dates. Plaintiffs do not allege that this express condition precedent was satisfied. Indeed, the pleadings indicate that Plaintiffs's status as "active employees" was terminated on or about October 31, 2000, more than two weeks before the would have allegedly been entitled to the second bonus. Moreover, the complaint does not allege that the nonoccurrence of this condition was ever excused or waived, nor does it suggest modification of Plaintiffs' status as at-will employees such that Defendant Broadwing was obligated, absent good cause, to retain them as employees until after date on which they allegedly would have been entitled to the second management bonus. Recognizing the qualified nature of the promised management bonuses, Plaintiffs contend in their opposition brief that their "termination was deliberately timed to deprive them of the management bonuses to which they would otherwise have been indisputably entitled." Pl.'s Mem. Opp. Mot. Dismiss at 1. The complaint, however, does not specifically allege bad faith on the part of the defendant, nor does it plead any facts to support such allegations. Accordingly, applying basic principles of contract law to Plaintiffs' complaint, the Court can reach no other conclusion but that it fails to sufficiently plead the existence of a binding contractual entitlement to the second management

bonus. Absent sufficient allegations of a legal entitlement, Plaintiffs cannot maintain a cause of action for recovery of such bonuses under the WPCL.

■ Similarly, Plaintiffs' complaint fails to state a claim for the recovery of certain "quarterly bonuses." Plaintiffs allege that "as a result of undocumented Compensation Plan changes" they were not paid "quarterly bonuses" for "the Third Quarter" as promised in the original April 2000 Compensation Plan. (Compl. at ¶¶ 30–32).[8] The Compensation Plan, pursuant to which Plaintiffs claim to have been entitled to these bonuses, provides simply that "top performers may earn a bonus upon measurement of final quarterly performance ...". (Compl. at Exhibit A). Eligibility for bonuses "quarterly bonuses will only be paid to active employees at the time of disbursements." *Id.* This qualification is repeated in the last section of the Plan entitled "Separation." *Id.* Plaintiffs do not allege that they remained active employees at the time of the "Third Quarter" bonuses were scheduled to be disbursed. Absent allegations that Plaintiffs have satisfied the conditions necessary to establish their eligibility for such bonuses, Plaintiffs' claim under the WPCL for recovery of these quarterly bonuses cannot survive a motion to dismiss.

■ Finally, Plaintiffs seek to recover stock options to which they allege to have been entitled but which have not been tendered. However, Plaintiffs' limited pleadings in this regard consist merely of the following: (1) "both Plaintiffs were also rewarded with stock options for performance results"; (2) "as a result of their termination, Plaintiffs were obliged to exercise those stock options within ninety

(90) days, to their considerable disadvantage." These vague allegations are clearly insufficient to establish a binding contractual entitlement to "stock options." Plaintiffs do not even provide the terms under which they were allegedly entitled to receive these stock options. Moreover, Plaintiffs do not allege facts supporting a claim that their performance entitled them to an award of stock options, nor do they even allege that any stock options to which they may have been entitled have not been tendered.

■ With respect to Plaintiff McGough, attached as an exhibit to the Complaint is a letter from Eclipse the retail sales division of IXC Communications dated August 26, 1998, over a year before Defendant Broadwing acquired IXC, confirming an offer of employment to McGough. The letter grants McGough $3,000 in stock options. The complaint does not allege that McGough never received these options, but rather observes that the letter further states that McGough would "also be *eligible* for an additional $2000 in stock options *based on performance.*" (Compl. at ¶ 35). No further explanation is provided regarding the circumstances under which McGough's performance would make him eligible for an award of additional stock options. Incorporating this letter into the pleadings by reference, the Complaint alleges that "while McGough ended that first year as the best District Sales Manager at 475% billed revenue to plan ... the balance of the options was never tendered." The discretionary language of the referenced offer letter, upon which the Plaintiff relies, without more, is not sufficiently definite to create a binding legal entitlement. Plaintiff has therefore not sufficiently stated a

---

**8.** Plaintiffs' complaint, which omits significant details necessary to understand the specifics of their allegations, does not provide

information from which the reference to the "Third Quarter" can be understood.

valid cause of action under the WPCL for recovery of these options.

### B.

■ Count V of Plaintiffs' Complaint alleges a violation of the Pennsylvania Commissioned Sales Representatives Act, 43 P.S. § 1471, et. seq. ("CSRA"). The CSRA imposes requirements on contracts between sales representatives and principals. *See* 43 P.S. § 1472. The statute also creates a cause of action pursuant to which sales representatives can recover unpaid commissions, exemplary damages, and litigation costs, from principals who wilfully fail to comply with the statute's provisions. *See* 43 P.S. § 1475. Both parties agree that the CSRA, by its terms, does not apply to those considered "employees" of the principal. The CSRA defines a "sales representative" as "a person who contracts with a principal to solicit wholesale orders from retailers rather than consumers and who is compensated in whole or in part, by commission. *The term does not include* one who places orders or purchases for his own account for resale *or one who is an employee of a principal.*" 43 P.S. § 1471. Since Plaintiffs allege and Defendant concedes the existence of an employer-employee relationship, the protections of the Act clearly do not extend to Plaintiffs.[9] Accordingly, Count V of Plaintiffs' complaint will be dismissed in its entirety.

### C.

In Count VI of their Complaint, Plaintiffs seek a detailed accounting of the commission payments which remain outstanding. Plaintiffs maintain simply that an accounting is necessary because the information needed to ascertain the precise sum of commissions which remain due and owing is exclusively within the possession of the Defendant. The complaint does not specify whether Plaintiffs seek an equitable accounting or an accounting at law. Defendant contends that regardless of whether Plaintiffs seek an equitable accounting or an accounting at law, Plaintiffs have failed to sufficiently allege the elements necessary to state an actionable claim for either type of relief.

■ Plaintiffs agree that they have not sufficiently alleged the requisite elements of an equitable accounting under Pennsylvania law. Most clearly, the availability of an adequate remedy at law for breach of contract prevents Plaintiff from maintaining a claim for an equitable accounting. *See Berger & Montague v. Scott & Scott,* LLC, 153 F.Supp.2d 750, 754 (E.D.Pa.2001); *Daikuzono v. Surgical Laser Technologies,* No. 96–0833, 1997 WL 52023, at * 4 (E.D.Pa. Feb. 3, 1997). However, Plaintiffs argue that their complaint does satisfy the requirements for stating a cause of action for an accounting at law.

The right to demand an accounting at law derives from Pa. R. Civ. P. 1021(a). *See Buczek v. First National Bank of Mifflintown,* 366 Pa.Super. 551, 531 A.2d 1122 (1987); *see also,* 14 Standard Pa. Prac.2d § 81:4 (1996) ("the right to demand an accounting at law is found in [Pa. R. Civ. P. 1021(a) ]"). The rule, which was originally promulgated in 1947 and pertains to any action at law, simply states: "Any pleading demanding relief shall spec-

---

**9.** Plaintiffs' explain in response to Defendant's motion to dismiss that this claim was included "solely as an alternative claim to relief in the event that Defendant attempts to abnegate the existence of an employer/employee relationship." Pl.'s Opp. Mot. Dismiss at 5. Defendant Broadwing represents, however, the status of Plaintiffs' as its former employees is not in dispute. *See* Def.'s Mem. Supp. Mot. Dismiss at 6. ("Thus, even assuming for purposes of argument that Defendant was a "principal," Plaintiffs as "employees" do not fall within the coverage of the CSRA.").

ify the relief to which the party deems himself entitled. Relief in the alternative or of several different types, including an accounting, may be demanded." Courts generally assume that "[t]he absence of any language in Pa. R. C.P. 1021 as to the circumstances under which an accounting [at law] could be sought suggests no intent to change the law as it existed" prior to promulgation of the rule in 1947. *Haft v. United States Steel,* 346 Pa.Super. 404, 407, 499 A.2d 676 (1985).

In support of its motion to dismiss Plaintiffs' accounting claim, Defendant Broadwing relies heavily on the following language in *Haft,* which purports to synthesize and summarize the law as it existed prior to the adoption of Rule 1021:

> [T]o establish a right to an accounting in an action at law in assumpsit, plaintiff must show:

> (1) there was a valid contract, express or implied, between the parties whereby the defendant

> (a) received monies as agent, trustee or in any other capacity whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for monies received by the defendant, *or*

> (b) if the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to account and the defendant failed to account and the plaintiff is unable, by reason of the defendant's failure to account, to state the exact amount due him, and

> (2) that the defendant breached or was in dereliction of his duty under the contract.

346 Pa.Super. at 407, 499 A.2d 676. Defendant correctly argues that the alleged factual circumstances underlying Plaintiffs claim plainly do not fall within the first category of cognizable claims for an ac-

counting at law. Clearly, Plaintiffs' complaint does not suggest that any monies were ever paid to Defendant or that Defendant has assumed fiduciary obligations with respect to Plaintiffs. However, Defendant ignores the second category which appears to recognize a viable accounting claim under a broader set of circumstances. While not referring specifically to the elements set forth in *Haft,* it is evident from the allegations in the complaint that Plaintiffs seek to invoke this second category.

Unfortunately, the limited body of caselaw in this area reveals few consistent, well-defined principles for determining the factual circumstances which must be alleged in order to state an actionable claim for an accounting at law. Plaintiffs insist simply that an actionable claim for an accounting at law is necessarily incidental to a breach of contract claim in circumstances where the failure of the breaching party to account leaves the aggrieved party unable to specifically calculate the amount owed under the contract. Plaintiffs' position appears to receive support among both courts and commentators. *See Buczek,* 366 Pa.Super. at 555, 531 A.2d 1122 ("[t]he right to relief in the form of an accounting pursuant to [Pennsylvania Rule of Civil Procedure] 1021 is merely an incident to a proper assumpsit claim."); *Daikuzono,* 1997 WL 52023 at *4 (E.D.Pa.1997) (noting that while plaintiff "is not entitled to an equitable accounting in this case because he has an adequate remedy at law-a breach of contract claim," Pennsylvania law "does permit [plaintiff] to request a *legal* accounting. That remedy is incidental to his contract claims."); *Layman v. Jenkins,* 76 Pa. D & C 533, 535 ("a right to an accounting is merely an incident to a proper claim of plaintiff against defendant sounding in assumpsit."); *see also,* 14 Standard Pa. Prac.2d § 81:4 (1996) ("the

right to relief in the form of an accounting pursuant to [Pa. R. Civ. P. 1021(a)] is merely incidental to a proper claim at law.").

Indeed, as one early decision observed, the promulgation of Rule 1021 in 1947 "did not enlarge or change the substantive conditions upon which an accounting may be sought in an action in assumpsit" but was rather "designed to merely continue unchanged the right to an accounting heretofore provided [for in] the Practice Act of May 14, 1915, P.L. 483, § 11, as amended by the Act of May 26, 1937, P.L. 895 § 1, 12 PS § 393." *Layman*, 76 Pa. D. & C. at 535–537 (1951); *see also, Haft*, 346 Pa.Super. at 406, 499 A.2d 676. The Practice Act of 1915, as amended, provided for an accounting at law in an action in assumpsit as follows:

> If either the plaintiff in his statement or the defendant in a counterclaim avers that the defendant or plaintiff has received moneys as agent, trustee, or in any other capacity for which he is bound to account to the plaintiff or defendant, *or if the plaintiff or defendant is unable to state the exact amount due to him by the defendant or plaintiff, by reason of the defendant's or plaintiff's failure to account to him, the plaintiff or defendant may ask for an account.*

12 P.S. 393. As this language suggests, in an action for assumpsit, an accounting at law was generally available under two sets of circumstances. In the most typical situation, one party has received money from the other party and is thereby obligated, in his capacity as a fiduciary, to account for the use and/or status of those funds. However, an aggrieved party was also given a right to demand an accounting under the broader set of circumstances where plaintiff is unable to state the exact amount due him because defendant has failed to account to him. *See Layman*, 76 Pa. D & C at 535 ("The very wording of Section 11 of the Practice Act shows that a right to an accounting is merely an incident to a proper claim of plaintiff against defendant sounding in assumpsit."). Here, Plaintiffs' have alleged that Defendant breached a contractual obligation to provide wages and commission in exchange for work performed prior to the time they were discharged. Plaintiffs' have further alleged that Defendant has sole possession of the documents and information needed to determine the total amount of commissions which remain due and outstanding. The Court concludes that these averments are sufficient under Pennsylvania law to survive a motion to dismiss for failure to state a claim for an accounting at law. *Accord Kotlinski v. Mortgage America, Inc.*, 40 F.Supp.2d 298 (W.D.Pa.1998).[10]

## III.

For the reasons set forth above, Plaintiffs' claim under the under the Pennsylvania Wage Payment and Collection Law (Count IV) will be partially dismissed. Defendant's motion to dismiss Plaintiffs' claim under the Pennsylvania Commissioned Sales Representatives Act (Count V) will be granted in its entirety. Defendant's motion to dismiss Plaintiffs' claim

---

**10.** Defendant further argues that "Plaintiffs seek nothing more in Count VI than information that they could obtain during the discovery process." Def.'s Mem. Supp. Mot. Dismiss at 7. The Court is unpersuaded that the possibility that Plaintiffs may obtain sufficient information during the discovery process to perform their own independent calculations of the amount of commissions owed warrants dismissing this basis for relief at this early stage in the litigation. In any event, if, as Defendant argues, all the information which Plaintiffs seek to compel Defendant to account for is made available during the discovery process, Defendants may, when appropriate, bring a motion for summary judgment on the grounds that Plaintiffs claim has been rendered obsolete.

for an accounting (Count VI) of allegedly unpaid sales commissions will be denied. The Court will issue an appropriate order.